UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,       No. 15-cr-20442
             Hon. Gerald E. Rosen

vs.

DAVON KEMP (D-1) and
TRAVOUGHN DANIELS (D-3),

    Defendants.
_____/

OPINION AND ORDER REGARDING
DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on May 31, 2016

PRESENT:  Honorable Gerald E. Rosen
      United States District Judge

INTRODUCTION

On July 16, 2015, the Grand Jury returned a six-count indictment against

Defendants Davon Kemp and Travoughn Daniels and three other co-defendants, Myron

Duncan-Plunkett, Raynaldo Galindo and Keven Samaniego.  All five Defendants are

charged with Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine

(Count I), and Attempted Possession with Intent to Distribute Cocaine, Aiding and

Abetting (Count II).  Defendants Kemp and Daniels are also charged with Possession

1

with Intent to Distribute Controlled Substances, Aiding and Abetting (Count III) and Possession of Firearms in Furtherance of a Drug Trafficking Offense (Counts IV and V).[1] Additionally, Daniels is charged with Felon-in- Possession of a Firearm (Count VI). All of these charges arise out of a controlled delivery of 5 kilos of cocaine and the same-day seizure of additional drugs, cash, drug evidence and firearms from Defendant Daniels' apartment on W. Grand Blvd. in Detroit on June 27, 2015.  Daniels and Kemp, through counsel, now move to suppress the evidence seized from Daniels' residence.

On May 17, 2016, the Court conducted an evidentiary hearing on the matter, at which it heard the testimony of DEA Detroit Group 6 Task Force Officer Shawn Reed. At the conclusion of the hearing, the Court took the matter under advisement.

Having now had the opportunity to review and consider the parties' briefs, the arguments of counsel, the testimony and the evidence submitted at the hearing held on May 17, 2016, and the Court's entire record of this matter, the Court is now prepared to rule on Defendant's Motion.  This Opinion and Order sets forth the Court's ruling.

<u>PERTINENT FACTS</u>

On June 25, 2015 Agents of the DEA Detroit Group 6 Task Force were notified by Texas State Troopers of their interception of a 1999 Chevrolet Silverado that was destined for delivery to Detroit, Michigan.  The Texas State Troopers intercepted the

---

[1]  Kemp and Daniels are both charged in Count IV; Daniels is charged alone in Count V.

Chevy Silverado while conducting a Federal Department of Transportation inspection on I-40 in Oldham County, Texas. During this inspection the Texas State Troopers discovered 5 kilograms of cocaine hidden in a spare tire stored beneath the undercarriage of the Silverado. The troopers learned in their investigation that the Silverado had been retrieved in Arizona where the transporters met an unknown Hispanic male going by the alias of "Mike Jones."  The transporters had been directed to haul the Chevy Silverado to 8920 W. 8 Mile Road in Ferndale, Michigan (on the border of Detroit) where Jones or another person was to take control of the vehicle.

A controlled delivery of the Chevy Silverado was thereafter arranged.

On June 27, 2015, DEA Task Force Officer Shawn Reed took possession of the 5 kilos of cocaine, and he and other members of the DEA Group 6 Task Force replaced the cocaine that was found in the spare tire of the Chevy Silverado with 5 replica kilograms of a sham substance containing a detectable amount of cocaine. A warrant was also obtained for GPS tracking of the Silverado and GPS device was placed on the truck.

At approximately 1:15 p.m. on June 27th, the car hauler, monitored by members of DEA Group 6, arrived at the Kroger parking lot at 8920 W. 8 Mile Road.  The driver of the car hauler was immediately met by Defendant Raynaldo Galindo.  Galindo paid the driver and took possession of the Chevy Silverado.  Galindo was observed placing an Arizona license plate on the rear of the vehicle.

3

Members of the DEA Group 6 surveillance team then observed a black 2009 Saab SUV, occupied by Defendants Myron Duncan-Plunkett and Davon Kemp. The Saab drove in tandem with the Chevy Silverado toward southwest Detroit.

Near the Michigan Avenue exit from I-96, the surveillance team observed a black Nissan Pathfinder, driven by Defendant Daniels, following the Silverado and the Saab. The three cars pulled into a Valero gas station at the corner of Vernor and West Grand Blvd. Galindo still driving the Silverado, picked up Defendant Kevin Samaniego at the gas station. Members of the surveillance team then observed the Silverado and the Nissan drive to the rear of a secured parking lot of a loft apartment building at 727 W. Grand Blvd. The Saab drove around the perimeter of the location during this time.

In the parking lot, Defendants Daniels, Samaniego and Galindo attempted to remove the spare tire which now contained the imitation cocaine. The Detroit DEA agents then made themselves known and  Daniels, Samaniego and Galindo were placed under arrest.

When he was arrested, Defendant Daniels produced a Michigan State Identification card which listed 727 W. Grand Blvd., Apt. 312 as his address. The DEA agents also discovered that Daniels had a .25 caliber handgun in his pocket.

Meanwhile, a traffic stop was conducted on the Saab which was occupied by Defendants Kemp and Duncan-Plunkett. Both occupants were taken into custody, as well.

4

Because it had rained heavily that day, there were large puddles of standing water on the gravel surface of the parking lot.  As a consequence of being placed on the ground at the time of his arrest, Daniels' clothing was wet and muddied.  Therefore, before being taken in for booking, the agents on the scene asked Daniels if he would like to change his pants and Daniels said he would like that opportunity. According to the Government, Daniels informed the officers of his apartment number (Apt. 312), identified the key on his key chain which would allow the officers to gain entry into his apartment to retrieve dry pants for him, and told the agents where to look in the apartment for his clothes.

The agents first did a protective sweep of the apartment. They did not locate any other occupants.  However, they observed an SKS assault rifle in plain view in an open closet immediately adjacent to the entry. (The weapon remained untouched until a search warrant was obtained.)  After their security sweep, the agents retrieved a pair of pants for Defendant and locked the residence with Defendant's key.

Task Force officers were subsequently posted outside the building to make sure no one else entered the apartment.  Other officers on the scene then transported the Defendants to the station for booking.

Meanwhile, Task Force Officer Shawn Reed, who was not, at the time, on site with the agents who arrested Defendants Daniels, Galindo and Samaniego, prepared an affidavit for a search warrant for a search of 727 W. Grand Blvd., Apt. 312 -- the address listed as Defendant Daniels' residence on his State Identification Card.

Shawn Reed has been a police officer with the Detroit Police Department for 16 and 1/2 years. Since 2003, Reed has been assigned to the narcotics section, and for the last eight years, he has been a member of the DEA Detroit Task Force.  He testified that he has been an affiant approximately 1,000 times for both federal and state search warrants.

Reed testified that he was not part of the team that surveilled the Defendants while they drove in tandem the approximately 11 miles from the Kroger parking lot in Ferndale to the parking lot at 727 W. Grand Blvd.  Rather, he was on patrol in full uniform in a marked police squad car, where he remained in radio contact with the surveillance detail, on stand by to assist.  He eventually effectuated the traffic stop of Defendants Kemp and Duncan-Plunkett who were driving in the black Saab, while the arrest of the other three defendants was taking place in the parking lot of the W. Grand Blvd. building.  After he took Kemp and Duncan-Plunkett into custody, Reed proceeded to draft the affidavit for the search warrant.

Reed testified that while he was preparing the warrant affidavit he was in radio and cell phone contact with the other Task Force officers and some of the information he included in the warrant affidavit was information conveyed to him by the other officers.

When questioned as to why he did not mention in his affidavit that a GPS tracking device had been placed on the Chevy Silverado, Reed said that he did not believe that the GPS was relevant to the search warrant.  He stated that the GPS had only been put on the

truck so it could be located in case someone attempted to drive away with it.  He added that, although someone from the Task Force was monitoring the GPS tracking, he did not believe the monitoring was used since the surveillance team had direct eyes on the vehicles at all times, except for the brief time when the truck was driven to the rear of the W. Grand Blvd. apartment building.

Reed also testified that there was no information included in the affidavit pertaining to the initial consensual entry by Task Force officers into Apt. 312 to obtain dry pants for Defendant Daniels, or the security sweep of the apartment done at that time. Reed explained that he was not present at the time of this initial entry into the apartment; he was in the process of taking Defendants Kemp and Duncan-Plunkett to the holding cell at that time, and then was occupied with typing up his affidavit.  Although Reed stated that he was eventually told about the agents' initial entry into the apartment to obtain dry pants for Defendant Daniels, he testified that he was not told about it until he had either already finished preparing his affidavit or was almost done with it.  Though he conceded that adding the information would not have been difficult since he was writing the affidavit on a computer, because he felt the facts he had already laid out in his affidavit were sufficient to obtain the search warrant, he did not want to delay getting the investigation done by having to take the time to add this information.

Reed was also questioned about the inconsistent identification as to which defendant took possession of and drove the Chevy Silverado from Ferndale to the W.

7

Grand Blvd. apartment.  In his warrant affidavit, Reed stated that it was Defendant Samaniego who took possession of and drove the Silverado, but in the affidavit he submitted two days later in support of the federal criminal complaint, Reed stated that the driver was Defendant Galindo.   Reed testified that his identifying of Samaniego in his warrant affidavit was a mistake made in haste; that it was Galindo who took possession of the truck.  He explained that he was not familiar with the names of the defendants at the time and that he had simply inverted the two defendants' names throughout the affidavit.

Reed stated that after he finished drafting his affidavit and an assistant prosecuting attorney approved it, Reed personally presented the affidavit and proposed search warrant to the magistrate.

The magistrate first was called to inform her that the Task Force needed to obtain a search warrant and the magistrate directed that Reed should meet her at her mother's house in Dearborn Heights where she was having dinner.  Reed met the magistrate in the living room of her mother's house around 5:30 p.m.  He swore to what was stated in his affidavit, and the magistrate judge signed the warrant.  Reed testified that the entire process took no more than ten minutes.

Reed further testified that he did not provide any information to the magistrate that was not included in his affidavit.  He further stated that the magistrate did not ask any questions and made only one modification to his warrant application:  she had Reed

8

write in the address of the location to be searched , "727 W. Grand Blvd., Apt. # 312, Detroit, MI," on page 3 of the document, because she wanted to make sure that the address appeared on each page, in case the pages got separated when the affidavit and warrant were filed with the court.  Both Reed and the magistrate initialed this addition.

Later that night, Task Force officers returned to Daniels' residence and conducted a search.

During the execution of the search warrant, the agents recovered approximately 50 grams of cocaine, 114 grams of heroin, packaging materials and a machine to heat seal plastic bags, the SKS assault rifle, over $35,000 in cash, narcotic ledgers, United States passports for Defendants Kemp and Duncan-Plunkett, airline tickets in Kemp's name for a recent flight to Belize, a lease agreement for the apartment in Duncan-Plunkett's name, Kemp's Macintosh computer, and handwritten notes containing instructions on how to transport narcotics across country without being detected by law enforcement, how to avoid detection from K-9 drug sniffs, and how to set up and operate a drug house.

Based on the controlled delivery of the Chevy Silverado, the surveillance of Defendants' activities on June 27, 2015, and what was discovered during the execution of the search warrant, on June 29, 2015, a federal Criminal Complaint was sworn out against Defendants Daniels, Kemp, Duncan-Plunkett, Galindo and Samaniego.  Then, on July 16, 2015, the Grand Jury returned its indictment.

9

<u>DEFENDANTS MOTIONS TO SUPPRESS</u>

Defendants Daniels and Kemp now move to suppress the evidence seized during the search of Daniels' residence.

Daniels' first argument for suppression is based on the agents' pre-warrant entry into his apartment to get dry pants for him. Defendant claims that he did not consent to the agents' initial entry into his apartment. The Government counters that Defendant's motion regarding a non-consensual warrantless entry and search when the agents entered the apartment to get Defendant a change of clothes should be denied as moot because evidence from Daniels' apartment was seized under a valid search warrant, and, therefore, even if there had been an unlawful initial entry (before the search warrant was issued), the "independent source rule" applies and suppression of the evidence is not required.

The "independent source rule" permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from lawful activities untainted by the initial illegality. *See Murray v. United States*, 487 U.S. 533,108 S.Ct. 2529 (1988).

*Murray*, like this case, was a drug conspiracy case. In that case, federal law enforcement agents, acting on information received from informants, had Murray and several of his co-conspirators under surveillance. While under surveillance, the agents observed Murray drive a truck and one of his co-defendants, James Carter, drive a

10

camper into a warehouse in South Boston.  When the two defendants drove out of the warehouse 20 minutes later, the surveilling agents saw within the warehouse two individuals and a tractor-trailer rig bearing a long dark container.  Murray and Carter later turned the truck and camper over to other drivers, who were, in turn, followed and ultimately arrested and the vehicles lawfully seized.  Both vehicles were found to contain marijuana.

After receiving this information, several other federal agents converged on the South Boston warehouse and forced entry.  They found the warehouse unoccupied, but observed in plain view numerous burlap-wrapped bales that were later found to contain marijuana.  The agents left without disturbing the bales, kept the warehouse under surveillance, and did not reenter it until they had a search warrant.

In applying for the search warrant, the agents did not mention the prior entry into the warehouse, and did not rely on any observations made during that entry.  When the search warrant was issued -- some eight hours after the initial entry -- the agents immediately re-entered the warehouse and seized 270 bales of marijuana and notebooks listing customers for whom the bales were destined.

Murray and Carter moved to suppress the evidence found in the warehouse.  The district court denied the motion and the First Circuit Court of Appeals affirmed.  Taking the opportunity to clarify the contours of the independent source doctrine, the Supreme Court subsequently granted certiorari and held:

11

The independent source doctrine ... rest[s] ... upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied.  So long as a later, lawful seizure is genuinely independent of an earlier, tainted one ... there is no reason why the independent source doctrine should not apply.

The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here.  This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

***

The District Court found that the agents did not reveal their warrantless entry to the Magistrate ... and that they did not include in their application for a warrant any recitation of their observations in the warehouse. . . .  It did not, however, explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse.   To be sure, the District Court did determine that the purpose of the warrantless entry was in part "to guard against the destruction of possibly critical evidence,"... and one could perhaps infer from this that the agents who made the entry already planned to obtain that "critical evidence" through a warrant-authorized search.  That inference is not, however, clear enough to justify the conclusion that the District Court's findings amounted to a determination of independent source.

Accordingly, we vacate the judgment and remand these cases to the Court of Appeals with instructions that it remand to the District Court for determination whether the warrant-authorized search of the warehouse was an independent source of the challenged evidence in the sense we have described.

487 U.S. at 542-44, 108 S.Ct. at 2535-36 (internal citations omitted; emphasis added).

As indicated, "[a]ccording to *Murray*, a subsequent search pursuant to a warrant

would not be an independent source of evidence unearthed by a previous search if the

information obtained during the first search was 'presented to the Magistrate and affected his decision to issue the warrant.'"  *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir.), *cert. denied*, 546 U.S. 813 (2005).  However, the Sixth Circuit -- and all courts of appeals to have considered the matter -- have interpreted *Murray* to mean that in these situations, for evidence to be inadmissible, the tainted information presented to the magistrate judge "must affect the judge's decision [on the search warrant application] in a *substantive* meaningful way."  *Id.* at 758 (citing *United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992) (emphasis in original).

> Under this interpretation of *Murray*, the simple fact that an application for a warrant contains information obtained from an illegal search does not by itself signify that the independent source doctrine does not apply.  If the application for a warrant "contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry.

*Id.* at 1141-42.  *See also United States v. Markling*, 7 F.3d 1309, 1315-16 (7th Cir. 1993) (considering whether probable cause remained after purging tainted information from a warrant and noting that "[t]his is the approach federal courts ... typically take" in applying *Murray*); *United States v. Restrepo*, 966 F.2d 964, 968-70 (5th Cir. 1992), *cert. denied*, 506 U.S. 1049 (1993) (interpreting *Murray* to mean that "evidence obtained in an illegal search is first excised from the warrant affidavit, after which the expurgated version is evaluated for probable cause"); *United States v. Halliman*, 923 F.2d 873, 880-81 (D.C. Cir. 1991) (finding that despite the inclusion of tainted information in a warrant

application, "there [were] overwhelming independent grounds for probable cause" in the application); *United States v. Gillenwaters*, 890 F.2d 679, 681-82 (4th Cir. 1989) (setting aside facts illegally obtained from the rest of the information in an affidavit and then examining the affidavit for probable cause); *United States v. Veillette*, 778 F.2d 899, 903-04 (1st Cir. 1985), *cert. denied*, 476 U.S. 1115 (1986) (same).

In this case, the Government states in its brief that "the agents' decision to seek the warrant was not prompted by what had been seen during the initial entry -- and the plain view observation of the assault rifle wasn't included as a basis for the probable cause in the search warrant affidavit [and] was not relied upon by the judge that authorized the warrant."

A review of the warrant bears out the Government's assertion that the agents' plain view observation of the assault rifle was not included as a basis for probable cause in the warrant affidavit. Further, Shawn Reed, the Task Force Officer who prepared the warrant affidavit and presented the affidavit and warrant to the magistrate, testified that he did not provide any information to the magistrate that was not in the affidavit. Officer Reed further testified that the decision to obtain a search warrant was made well before other Task Force agents entered Daniels' apartment to get Defendant Daniels dry pants. Reed was not present when the other officers made this initial entry; he was charged with taking Defendants Kemp and Duncan-Plunkett to the holding cell and then was occupied with typing up his warrant affidavit. He testified he was not even told about the entry

14

until either after he was finished typing up his affidavit or almost done with it.

The Court credits Officer Reed's testimony, and based on his testimony, the Court concludes that the warrant-authorized search of the warehouse was an independent source of the evidence challenged by Defendants.[2]

Of course, in order for the independent source rule to apply a *valid* search warrant is needed. Both Defendants Kemp and Daniels challenge the validity of the search warrant. They argue that the affidavit in support of the warrant request was a "bare bones" affidavit and provided insufficient cause to believe that evidence of criminal activity would be found at Daniels' residence. Specifically, they contend that the affidavit contains an insufficient "nexus" between the alleged criminal activity and the location to be searched.

An affidavit is bare bones when it "contains only 'suspicions, beliefs, or

---

[2] Though not argued by the Government, the Court also finds that the "inevitable discovery" doctrine would render the challenged evidence admissible, as well. The inevitable discovery rule is "an extrapolation of the independent source doctrine." *Murray*, 487 U.S. at 539. The inevitable discovery doctrine allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means. *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509 (1984); *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) ("[T]he inevitable discovery exception to the exclusionary rule applies when ... evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first."). "'The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995) (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir.1992), *cert. denied*, 510 U.S. 1045 (1994)).

conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2004) (citing *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir.1996)). A magistrate's issuance of a search warrant based on a "bare bones" affidavit constitutes an arbitrary exercise of discretion and does not meet the requirements of the Fourth Amendment. *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008); *Weaver*, 99 F.3d at 1377-78.

A search warrant comports with the Fourth Amendment if it was issued by a "magistrate [who] had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing. . . ." *United States v. McPherson*, 469 F.3d 518, 523-24 (6th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Such a conclusion depends on the totality of the circumstances and should not be set aside unless arbitrarily drawn because, as noted by the Sixth Circuit in *McPherson*, "great deference" should be accorded to the determination of probable cause made by a state magistrate. *Id.* (citing *United States v. Weaver*, 99 F.3d 1372, 1376 (6th Cir. 1996). However, the Court must "insist that the magistrate perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar v. Texas*, 378 U.S. 108, 111 (1964), *overruled on other grounds*, *Gates*, 462 U.S. at 238. 567.

"For the magistrate to be able to properly perform this official function, the

affidavit presented [in support of the search warrant] must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *McPherson*, 469 F.3d at 524; *Weaver*, 99 F.3d at 1376. The affidavit must contain particularized facts demonstrating "a fair probability that evidence of a crime will be located on the premises of the proposed search." *McPherson*, 469 F.3d at 524 (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). This requires "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.) (*en banc*), *cert. denied*, 543 U.S. 851 (2004) (internal quotation omitted).  In other words, the affidavit must suggest "that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought" and not merely "that the owner of property is suspected of crime." *McPherson* at 524 (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).      However, the Sixth Circuit has emphasized that "line-by-line scrutiny [of an underlying affidavit is] ... inappropriate in reviewing [a] magistrate['s] decisions." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir.) (*en banc*), *cert. denied* 531 U.S. 907 (2000) (quoting *Gates*, 462 U.S. at 246 n. 14, 103 S.Ct. 2317).  Such "a hypertechnical critique of warrants would only, in the end, encourage warrantless searches, undermining the very Fourth Amendment right such an approach would seek to protect." *Id.*

Turning to the case at hand, despite Defendants Kemp and Daniels's contentions,

17

under the totality of the circumstances presented in the affidavit in question, there was sufficient basis for the magistrate to conclude that there was a fair probability that evidence of narcotics trafficking or fruits of illegal activity would be found at 727 W. Grand Blvd., Apt. 312.

In his affidavit, Officer Shawn Reed, the warrant applicant, attested to his then 15-year experience as a police officer and his specialized experience in narcotics interdiction with the DEA Group Six unit. [Warrant Affidavit ¶ 1]. Officer Reed further related with particularity the interception of the Chevy Silverado in Texas and the 5 kilos of cocaine found concealed in a spare tire on the truck, the arrangement of the controlled delivery of the sham cocaine, the surveillance of the delivery and the subsequent transport of the truck with the contraband by two of Kemp and Daniels' co-defendants, Defendants Samaniego and Galindo, from Ferndale, while being accompanied by two other vehicles following in tandem, one being a black Saab (later found to be occupied by Defendants Kemp and Duncan-Plunkett) and the other the black Nissan driven by Defendant Daniels. [Warrant Affidavit ¶¶ 2-3].

The affidavit further states that surveillance was maintained over these three vehicles while they proceeded from Ferndale to 727 W. Grand Blvd. in Detroit,[3] where the Silverado (driven by Galindo) and the Nissan driven by Defendant Daniels parked

---

[3] The Court takes notice that, according to Google maps, the Defendants drove in tandem a distance of approximately 11.5 miles.

18

behind the loft apartment building.  *Id.*  The affidavit further states that members of the Group 6 Task Force observed Defendants Daniels, Galindo and Samaniego remove the spare tire containing the sham cocaine and they were thereafter detained by the agents. When he was apprehended, Defendant Daniels, who was found in possession of a firearm, produced a Michigan identification card with the address 727 W. Grand Blvd., Apt. 312.  *Id.*  Paragraph 3 of the warrant affidavit concludes, "This is the same location the kilograms were transported to. . . ."  [Warrant Affidavit ¶ 3].

In the final paragraph of the Affidavit, Officer Reed stated that the behavior of the defendants described in the Affidavit is "consistent [with] a drug trafficking organization."  [Warrant Affidavit ¶ 4]  He further stated that, based on prior investigations, drug traffickers keep records and names, addresses, phone numbers and email addresses, or other identifying information of their criminal associates in their residences, and that in executing prior search warrants after observing the same types of activities observed in this case, he has recovered narcotics, narcotics paraphernalia, narcotics proceeds and firearms. *Id*.

Officer Reed's Affidavit is hardly "bare bones." As is evident, it contained far more than mere "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Laughton*, 409 F.3d at 748.

Even if the Court were to find that the Magistrate Judge erred in issuing the search

19

warrant, the "good faith" exception established in *United States v. Leon*, 468 U.S. 891 (1984), would apply. *Leon* stands for the proposition that "the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *Weaver*, 99 F.3d at 1380 (quoting *Leon*, 468 U.S. at 905). There are only four exceptions to *Leon*'s applicability:

> (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2), if the issuing magistrate wholly abandoned his judicial role; (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or in other words, where the warrant application was supported by nothing more than a "bare bones" affidavit; and (4) if the warrant was facially deficient -- i.e., failing to particularize the place to be searched or the things to be seized.

*Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998), *cert. denied*, 526 U.S. 1077 (1999) (enumeration added; citations omitted).

Defendants do not contend that the magistrate abandoned her role as a neutral arbiter in issuing the warrant, nor do they argue that the warrant failed to particularize the place to be searched or things to be seized. Thus, the Court need only determine whether the affidavit "was so lacking in indicia of probable cause as to render official belief in its existence unreasonable."

The standard by which an affidavit is to be judged for purposes of the "good faith" exception "'is a less demanding showing than the "substantial basis" threshold

20

required to prove the existence of probable cause in the first place.'" *United States v. Carpenter*, 360 F.3d at 595.

There have been a number of cases in the Sixth Circuit which involved questions about the nexus between criminal activity and places, where the appellate court found that probable cause did not exist but that the *Leon* good faith exception should apply. *See e.g.*, *United States v. Washington*, 380 F.3d 236, 242 (6th Cir. 2004); *United States v. Carpenter,* 360 F.3d at 595; *United States v. Van Shutters,* 163 F.3d at 336-38; *United States v. Schultz*, 14 F.3d 1093, 1097-98 (6th Cir. 1994). In all of these cases, the appellate court was satisfied that the good faith exception should apply to render the searches therein valid. In these cases, the court specifically found the nexus requirement satisfied because in each case there was "some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched." *United States v. Laughton*, 409 F.3d at 749. Here, that standard is easily met.

The Silverado with the concealed kilos of pseudo-narcotics was delivered to 727 W. Grand Blvd. Defendant Daniels was among the three co-defendants caught in the act of removing the spare tire containing the concealed sham drugs from the truck in the parking lot behind the building bearing the address "727 W. Grand Blvd." Daniels had followed the Silverado and drove in tandem with the truck during the course of the 11.5 mile trip from Ferndale where the truck was delivered to Galindo to its end destination at 727 W. Grand Blvd. When he was apprehended in the lot behind 727 W. Grand Blvd.,

21

Defendant Daniels produced a state ID card which showed his address as 727 W. Grand Blvd., Apt. 312. Officer Reed stated in the affidavit that he had 15 years experience as a police officer doing narcotics interdiction. He further stated that based on his experience and training -- including his experience executing narcotics search warrants -- that there was a fair probability that evidence of narcotics trafficking, including narcotics, records pertaining transactions and the proceeds thereof, and firearms would be found in a narcotics trafficker's residence. Based on a totality of circumstances, the warrant affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Therefore, the third exception to *Leon*'s applicability does not apply here.

Defendants also argue that *Leon* does not apply because the issuing magistrate was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth. Defendants point to the final statement in paragraph 3 of the Affidavit which states, with respect to 727 W. Grand Blvd. Apt. 312, that "this is the same location the kilograms were transported to by SAMANIEGO." Specifically, Defendants challenge the inclusion of "Apt. 312" as having misled the magistrate in the issuance of the warrant to search that apartment.

However, as indicated, the Court must read the affidavit in its totality and not engage in a line-by-line, word-by-word hypertechnical analysis. While it is true that nothing else in the Affidavit other than this one sentence specifically states that the

22

delivery was to be to Apt. 312, it is unlikely that it was this one sentence that led the magistrate to issue the warrant to search Apt. 312. Indeed, reading the affidavit in its totality, it was not unreasonable for Officer Reed to have construed the drugs as having been at least "constructively" delivered to 727 W. Grand Blvd., Apt. 312 as that is the apartment belonging to Defendant Daniels and, as stated in the affidavit, Defendant Daniels was apprehended in the parking lot behind the apartment building while attempting to remove the drugs from their hiding place in the spare tire (after having escorted the truck carrying the concealed drugs to that location), and Defendant Daniels produced a state ID that listed 707 W. Grand Blvd., Apt. 312 as his address.[4]

Defendants also argue that in addition the above allegedly misleading information, Officer Reed also omitted "critical facts" from his Affidavit, to-wit (1) that a GPS tracker had been placed on the Silverado and that was being monitored by the officers; (2) that officers allegedly obtained consent from Defendant Daniels to enter Apt. 312; (3) that

---

[4] As for the mistaken identification of Defendant Samaniego as the driver of the Silverado who transported the drugs to the parking lot of 707 W. Grand Blvd., Officer Reed testified at the May 17 hearing that the affidavit he submitted in support of the criminal complaint two days after the search, on June 29, 2015, correctly identified Defendant Galindo as the individual who accepted delivery of the Silverado in Ferndale and drove the vehicle with the pseudo-cocaine in the spare tire to the parking lot of the 707 W. Grand Blvd. building. Reed admitted that the mis-identification of Defendant Samaniego as the driver of the Silverado in his warrant affidavit was a mistake he attributed to his lack of familiarity with the names of the defendants and his haste in preparing the search warrant affidavit. As he pointed out at the May 17 hearing, throughout the search warrant affidavit he had simply inverted the names of "Galindo" and "Samaniego," and there was no intention to mislead the magistrate.

23

officers took keys from Defendant Daniels to enter his apartment; (4) that officers made a warrantless entry of the apartment and conducted a "protective sweep"; (5) that during the protective sweep, the officers observed an SKS rifle in a closet; and (6) that after the initial entry, the officers entered again with Defendant in custody to obtain a pair of pants.   Defendants argue, without any citation to any authority, that Officer Reed's omission of the above information "suggests an intent to conceal these facts from the magistrate" and that "[i]t is quite likely, that had the magistrate known of the prior entries, she may have either questioned the tactics or questioned the credibility of the affiant" and decided not to issue the warrant.

Defendants engage in pure speculation here.  More importantly, they have failed to demonstrate how any of the above omissions negate the magistrate's finding of probable cause.  "[T]o be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have undermined the showing of probable cause." *United States v. Duval*, 742 F.3d 246, 251 (6th Cir.), *cert. denied*, 135 S.Ct. 116 (2014) (quoting *United States v. Carpenter*, 360 F.3d 591, 596-97 (6th Cir. 2004) (*en banc*)).  Defendants cannot show that these omissions undermined the showing of probable cause.

Officer Reed was questioned extensively at the hearing about each of the above-enumerated omissions.  As for having omitted from his affidavit that a GPS tracker had been placed on the Silverado, Reed testified that he did not mention the GPS tracker

24

because he did not believe it was relevant.  He explained that Task Force officers had direct eyes on the vehicle at all times while it was en route to 707 W. Grand Blvd. (except at the very end of the trip when the truck drove to the rear of the 707 W. Grand Blvd. apartment building) and that the tracker was put on the truck only so it could not be driven away suddenly.  Though Reed admitted that the GPS was monitored by a Task Force Officer, he testified that the officers relied on their direct surveillance of Defendants, not the GPS monitoring.

With regard to the issue of Daniels' consent to Task Force officers entering his apartment and their discovery during a protective sweep of the apartment of the rifle in the hallway closet, Officer Reed credibly testified that he did not include any reference to the initial entry as he was unaware of it since was not present on the scene at the time; he was then occupied taking Defendants Kemp and Duncan-Plunkett to the holding cell and typing up the warrant application.  Reed said he was told about the circumstances of the entry, the protective sweep, and discovery of the rifle either after he had finished typing up his affidavit or almost done with it,  And although he was informed about this initial entry before he went to see the magistrate, he did not re-write his affidavit or tell the magistrate about it because he felt that the facts laid out in his affidavit were sufficient and he wanted to save time so that they could get the investigation done.

In sum, the Court finds no evidence that Officer Reed deliberately or recklessly omitted any information from his affidavit or that any of the complained of omissions

25

undermine the finding of probable cause.  Indeed,  as the Court pointed out to defense

counsel at the suppression hearing, most -- if not all -- of the omitted information would

have further supported a finding of probable cause for the issuance of the warrant, not

undermined it.  Accordingly, the Court concludes that the search of Defendant Daniels'

residence was valid.[5]

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Daniels' and Kemp's Motions to

Suppress **[Dkt. Nos. 91 and 93]** are DENIED.

s/Gerald E. Rosen
United States District Judge

Dated:  May 31, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on May 31, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

---

[5]  The Court's determination that the search pursuant to the warrant was valid and
that the independent source rule applies renders it unnecessary for the Court to address
Defendant Daniels' argument that he did not consent to the agents' pre-warrant entry into
his apartment.

26